MONARCH THEATRES, Inc., v. HELVER-
ING, Commissioner of Internal
Revenue.

No. 108.

Circuit Court of Appeals, Second Circuit.

July 19, 1943.

Samuel Spring, of New York City, for petitioner.

Meyer Rothwacks, of Washington, D. C., Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Muriel Paul, Sp. Asst. Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

(The following opinion was written under the assumption that it would represent the opinion of all three of the judges. It turns out that, as to the note for $65,125.51, I am in the minority, for Judge CHASE concurs in the opinion of Judge AUGUSTUS N. HAND. It has seemed to us best, however, to allow this opinion to stand, except as to that note, since in other respects it states the views of all. It will of course be understood that the decision of the majority will govern as to the note for $65,125.51).

This appeal involves deficiencies in the income tax and surtax of the taxpayer for the years 1936 and 1937. The question is as to the computation of "its undistributed net income" for those years, as defined by § 14(a) (2) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 823; in particular, as to the meaning of § 26(c) (1), 26 U.S.C.A. Int.Rev.Acts, page 836, which allows a deduction from the "adjusted net income" of any sums which cannot be distributed as dividends "without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends." The Commissioner and the Tax Court have both held that the provisions in three resolutions passed by the taxpayer and in its share certificates, did not comply with this section; and that is the only issue.

The facts are as follows. The taxpayer was organized in New York on September 2, 1933. It eventually had five shareholders, of whom one, Sam Katz, owned 510 shares, Harry Katz, 165, Feld, 150, Chatkin 150, and Furman, 25. On the day of its organization, Harry Katz, on behalf of Sam Katz, wrote a letter, offering to transfer to the company a number of shares in theatre companies owned by Sam Katz, in exchange for the whole issue of the taxpayer's common shares to those persons whom he should name, and a note in the sum of $14,560 to a payee to be named by Sam Katz. The letter concluded: "I am also relying upon your assurance that the Corporation will declare no dividends on its stock unless and until the promissory note above referred to is paid in full." The company's directors met on the 4th; the letter was read to them and spread upon the minutes, and they passed a resolution accepting the offer, and concluding: "no dividends shall be declared by this Board upon the stock of this corporation, so long as the corporate liabilities shall exceed the sum of One Thousand ($1,000.) Dollars."

On September 4th, Sam Katz himself wrote a letter to the company, acknowledging receipt of the note for $14,560, declaring that the company was indebted to him in the additional sum of $65,125.51 for money lent "since the organization of your corporation," and asking for a note for this and "adequate collateral." Since this letter spoke of the $14,560 note as already executed and delivered, the letter must have been written, or at least delivered to the company, after the resolution just mentioned. The company at once passed a second resolution authorizing the delivery of a promissory note to Sam Katz in the sum demanded, giving him certain collateral, and concluding in substance as before: i. e. "this Board will not declare any dividends on the capital stock of this corporation so long as the corporate liabilities shall exceed the sum of One Thousand ($1,000) Dollars."

Thereafter, at times not specified, Sam Katz lent more money to the company, so that throughout the years 1936 and 1937 it owed him in all more than $146,000. He conveyed the shares in the theatre companies to the taxpayer, and directed the issue of the shares. The two Katzes, Feld and Chatkin also entered into a personal agreement on September 4th, in which Feld and Chatkin promised not to vote their shares in favor of any change of an existing by-law that forbad any dividend while the debts exceeded $1,000. On October 31, 1933, the company passed a resolution "approving" this agreement, and all share certificates bore the legend that the shares had been issued subject to its provisions. (On March 3rd, 1934, the two Katzes brought in Furman, under a similar agreement.) The result was that Feld, Chatkin and Furman were bound not to vote to change the by-law; that a notice of this

contract was endorsed upon all certificates, and that the company itself, by resolution, had agreed with the two Katzes not to declare dividends until the debts were paid.

■ The taxpayer relies: first, upon the legend on the certificates, incorporating by reference the shareholders' agreement of September 4th, 1933, and the resolution of October 31, 1933, "approving" it; second, upon the two resolutions of September 4th, 1933, both in substance the same, declaring that the company would declare no dividends while its liabilities were more than $1,000. As to the legend, even though we should agree that a share certificate was a contract "executed" by the corporation, it will not serve. It was not a promise not to pay dividends; it went no further, and was intended to go no further, than to give notice to successors in interest of the original shareholders that their predecessors had agreed not to amend the by-law. Nor did the resolution answer any better. Even if the mere "approval" of the shareholders' agreement is to be taken as a promise not to declare dividends, it was without consideration and bound the corporation to nothing. It is true that these transactions were as a whole effective to prevent the declaration of dividends until all debts were paid; and that they therefore protected Sam Katz and also constituted an enforceable contract executed by the company. They prevented Feld, Chatkin and Furman and the assignees of their shares from voting to rescind the by-law, and, since Harry Katz was Sam Katz's dummy, the declaration of dividends lay completely in his power. Indeed, for that matter he was protected without any contract, so long as he kept 510 shares of the stock. But it is not enough under § 26(c) (1) merely to show that the company is in fact prevented from declaring dividends; the prevention must be of the kind described. Helvering v. Northwest Steel Rolling Mills, 311 U.S. 46, 61 S.Ct. 109, 85 L.Ed. 29, settled that once and for all; and the result is often extremely harsh.

■ The resolutions of September 4th, 1933, stand on a different footing. It is true that a number of circuit courts of appeal have declared that a charter provision, a by-law, a share certificate, or a corporation resolution will not be regarded as a contract within the section. Atlas Supply Co. v. Commissioner, 10 Cir., 123 F.2d 356; Caroline Mills v. Commissioner, 5 Cir., 126 F.2d 857; Metal Specialty Co. v. Commissioner, 6 Cir., 128 F.2d 259; Mastin Realty & Mining Co. v. Commissioner, 8 Cir., 130 F.2d 1003; Bishop & Babcock Manufacturing Co. v. Commissioner, 6 Cir., 131 F.2d 222; Elliott Addressing Machine Co. v. Commissioner, 1 Cir., 131 F.2d 700. And while it is possible to distinguish nearly all of these decisions upon the facts, they did not go upon any such distinction, or mean to limit the generality of what they said. The Third Circuit in Lehigh Structural Steel Co. v. Commissioner, 127 F.2d 67, did hold that a provision in the share certificates and the charter made for the protection of a group of shareholders who acted in reliance upon it, would protect the corporation under § 26(c) (1); but it stands alone. Nevertheless, although we draw from these decisions the conclusion that such provisions do not comply with § 26(c) (1), we need not hold that the mere fact that the corporate promise is in the form of a resolution, or indeed of a by-law or a charter provision, need make it nugatory. That should depend upon whether the resolution—and perhaps also a by-law or a charter provision—does, or does not, contain a complete contract, taken in conjunction with any other documents of which it is properly a part. If it does not, it will not be within § 26(c) (1), even though it may have been intended to be acted upon by creditors, and though creditors have acted in reliance upon it. On the other hand, if the resolution and its appurtenant writings do contain all the terms of a contract within § 26(c) (1), we hold that the mere fact that it is in the form of a resolution is not material. The passage of a resolution is as good an "execution" of a contract, as to have the officers sign and seal it. Delano v. Trustees of Smith Charities, 138 Mass. 63. Indeed, it is the exercise of a more direct authority, since it is the act of the directors themselves. The often quoted language of Mr. Justice Black in Helvering v. Northwest Steel Rolling Mills, supra, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29, was used discursively and by way of example; it is not to be understood as laying down absolute doctrine.

■ Turning then to the facts in the case at bar, the first resolution of September 4, 1933, taken in conjunction with the letter of Harry Katz to which it replied, created a contract within § 26(c) (1). It accepted a written offer based upon adequate consideration—the promise to transfer the theatre shares—and one of its

terms was that no dividend should be declared until the $14,560 note—part of the purchase price—had been paid. True, although the acceptance covered all liabilities of the company, it left open the power to declare dividends when they had been reduced to $1,000. But the two Katzes were present at the meeting and voted for the resolution; and the variance was clearly acceptable to them. The second resolution of September 4, 1933, which purported to accept Sam Katz's proposal of the same date did not conform with these requirements. He had already lent the sum of $65,125.51, for which he asked only a note and collateral; he did not ask—as Harry Katz had asked in order to protect the $14,560 note—that no dividends should be declared until this second note was paid, and Harry Katz's request had been specifically limited to the first note. The record does not even disclose that Sam Katz lent the $65,125.51 in reliance upon the assurance of the first resolution; perhaps he did, but if so, for the reasons just given it would make no difference. That would indeed have put the company under obligation to him as to that loan, but the contract so created would not satisfy § 26(c) (1). The same reasoning answers any argument based upon the later loans of Sam Katz if they could be proved to have been in fact made in reliance upon either resolution. The result is that, although the deficiency was wrongly computed, it was wrong only as to the $14,560 note. The order must therefore be reversed and the cause remanded for recomputation of the deficiency in accordance with the foregoing.

Order reversed.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

■ I cannot agree to the conclusion in the opinion of Judge L. HAND that the deficiency computed was wrong only as to the $14,560 note. I think it was also wrong as to the note for $65,125.51. It appears from the stipulation that on September 4, 1933, the taxpayer was indebted to Sam Katz in the sum of $65,125.51 for money loaned since the organization of the corporation. He wrote to the corporation that it was his desire that it execute and deliver to him as evidence of this indebtedness its promissory note payable on or before three years from date with interest at the rate of 6% per annum and that the corporation further deliver to him adequate collateral to secure the payment of such note. There-

upon at a meeting of the board of directors of the taxpayer at which Sam Katz, who was one of the directors, was present, this letter was presented, spread upon the minutes, and the board of directors adopted a resolution reciting the letter which Katz had addressed to the corporation and resolving that the corporation execute and deliver to Sam Katz its promissory note payable to him on or before three years from the date thereof, with interest at 6% per annum payable quarterly, in the amount of $65,125.51, and that the board would not declare any dividends on the capital stock of the company so long as the corporate liabilities should exceed the sum of $1,000. It was further resolved that the treasurer be authorized and directed to deliver, endorsed in blank, to Sam Katz as collateral security for the payment of its entire indebtedness to him in the sum of $65,125.51, 200 shares of common stock in the Akron Palace Theatres Corp., 200 shares of common stock in the Public Square Theatre Corp., and 100 shares of common stock in the Indianapolis Theatre Management Associates, Inc. This resolution was signed by the assistant secretary and by the directors, including Sam Katz. Thereafter, the note referred to in the resolution was delivered to and accepted by Sam Katz.

At the time Katz wrote his letter to the corporation asking for the note and collateral, the company made a counter-offer. Whether the corporation made the counter-offer containing the dividend restriction because it was not willing or able to furnish as much collateral security as Katz desired, or for some other reason, does not appear in the record, but the fact is that the company offered a three-year note in place of an indebtedness to Katz that was already due and payable forthwith, an agreement that the board of directors would not declare dividends so long as the corporate liabilities should exceed $1,000, and an agreement to deliver specified collateral. Katz on his part accepted this arrangement by giving up his right to immediate collection of the $65,125.51 indebtedness and taking in its place a note for that amount payable in three years. In other words, the corporation made an offer which was accepted by Katz, the latter furnishing the consideration of forbearance to demand immediate payment of his claim. This, I think, amounted to a contract which was reduced to writing and executed by the board of directors and was binding on the

corporation in respect to the provision limiting the power to declare dividends. The agreement between the corporation and its creditor was executed with at least the formality required by the statute and to me it seems plain that Congress never intended the deduction to be unavailable to corporations situated as this one was.

In view of the fact that the income of the corporation during the years 1936 and 1937 was insufficient to enable it to relieve itself of the limitation on its right to declare dividends contained in the agreement respecting the debt of $65,125.51, it is unnecessary to consider whether the later loans may also be within Section 26(c) (1).